# UNITED STATES DISTRICT COURT
## MIDDLE OF TENNESSEE
### NASHVILLE DIVISION

LYNN STONE,                      )
)
           **Plaintiff,**         )
)
       **v.**                    )    **No. 3:12-00762**
)    **Judge Sharp**
**PREMIER ORTHOPAEDICS AND**  )
**SPORTS MEDICINE, PLC**      )
)
          **Defendant.**        )

## MEMORANDUM

Pending before the Court in this employment discrimination action is the fully briefed Motion for Summary Judgment filed by Defendant Premier Orthopaedics and Sports Medicine, PLC ("Premier") (Docket No. 38). For the reasons that follow, that Motion will be granted.

## I. Factual Background

Premier is engaged in the practice of orthopaedic, sport, and occupational medicine. On November 5, 2007, it hired Plaintiff Lynn Stone, a Caucasian female (who states in her Complaint that she "ha[s] some Native American heritage"), as a Front Desk Receptionist in the Magnet Resonance Imaging ("MRI") Department. Plaintiff received Premier's Employee Handbook at the time of her hire.

Among other things, a Front Desk Receptionist provides administrative and receptionist support for the MRI clinic. The receptionist greets and registers patients, updates demographics, prepares patient charts, schedules appointments, performs insurance verifications, straightens rooms

and the lobby, stocks supplies,[1] and performs other duties as requested or required.

Plaintiff was the night shift Front Desk Receptionist, and generally worked from 12:00 p.m. or 12:30 p.m. to 8:00 p.m.  Julie Mathis, a Caucasian female, worked as the day shift receptionist, generally from 7:00 a.m. to 3:30 p.m.

The Front Desk Receptionists were directly supervised by Ann Harper, a 61-year old Caucasian female, who worked as an "Ancillary Coordinator" during Plaintiff's employment.  Ms. Harper made the decision to hire Plaintiff.

Employees in the MRI department worked in a small office where the Front Desk Receptionists and the MRI technicians sat in the same U-shaped area.  The MRI technicians included Michael Tweedie, a 42-year old Caucasian male, James Crook, a 40-year old Caucasian male, and James Beaty, a 50-year old African American male.  In addition to being a MRI technician, Mr. Beaty managed the other technicians, although Plaintiff claims that he also "co-managed" the clerical staff with Ms. Harper.

In early 2010, Ms. Harper received patient complaints regarding Plaintiff's attitude.  Ms. Harper noticed her unpleasant attitude, and also that Plaintiff did not clock in and out consistently and, on occasion, worked later than necessary.

Premier's written timekeeping policy required that employees accurately record their time. Without prior approval, employees are supposed to clock in no more than 10 minutes prior to the scheduled start time, and clock out no more than 10 minutes after their scheduled stop time.

On July 20, 2010, Ms. Harper verbally warned Plaintiff that she needed to clock in and out

---

[1]  While Plaintiff acknowledges that the task of stocking supplies includes restocking chips, drinks and candy, Plaintiff claims that she was the only front desk clerk asked to perform those duties.

for lunch, and not take any unnecessary overtime.  Plaintiff was warned that if she continued on the "present path," she would be written up.

On August 20, 2010, a patient's wife emailed Ms. Harper and Mr. Beaty to complain about Plaintiff.  According to the email, Plaintiff rudely stated there was an issue with the appointment and did not want to hear an explanation from the patient's wife.  Even after Plaintiff was told that the patient had driven 1½ hours to get to the appointment, Plaintiff said he could not be seen.  Nevertheless, the patient decided to stay and was eventually seen, although Plaintiff continued to be rude.

On August 27, 2010, Plaintiff was written up for failing to keep accurate time between August 16 and August 26, 2010, and for being rude to patients and not providing good customer service. The Employee Warning Notice was signed by Plaintiff and Ms. Harper and indicated that the "consequence should [an] incident occur again" would be "termination."  (Docket 40-12 at 1). Premier claims that, despite the warning,  Plaintiff's rudeness became progressively worse.

On September 16, 2010, Plaintiff and Mr. Crook, a MRI technician, were involved in a verbal altercation.  The altercation occurred after Mr. Crook inquired about a mistake with scheduling appointments for patients that affected the overall schedule in the MRI department.  Mr. Beaty was not in the office the day of the altercation, but was advised of the incident the next day.

On September 20, 2010, Mr. Beaty forwarded to Ms. Harper an email from Mr. Crook regarding the incident.  Mr. Crook explained the occurrence, in part, as follows:

> . . . a patient came in for an appointment that was not on the schedule. After looking up pt's information it was found that Lynn had cancelled the appointment. The pt hadn't called to cancel and the paperwork seemed to be fine so we went ahead with the MRI. We then had two patients scheduled at the same time which of course put us behind. Lynn came in and I asked the reason for the canceled appointment. A patient the evening before (Wednesday) came for an appointment which was also not

on the schedule. Her appointment date and time on our schedule was for the following day. An error was made when she was scheduled and was given the wrong date. She was done that evening (Wed). [Plaintiff] had gone into Thursday's schedule to take the pt off because she had been done but in doing so, canceled the wrong patient. The reaction and behavior from [Plaintiff] towards me when ask[ed] about the situation was unprofessional and aggressive. She became very angry and started raising her voice at me. She called me an asshole told me that if I have any problem with any error made by her that it should be taken up with her supervisor. She would not have a calm discussion. Anytime I bring an error to her attention, I get nothing but attitude and I would like it to stop. . . . [Ms. Mathis] makes mistakes and when they are pointed out, she fixes them quickly with no attitude or anger.

(Docket No. 40-14 at 1).

Plaintiff recalls the altercation differently. She claims that, upon arriving at work and while greeting her co-workers, she was verbally attacked by Mr. Crook. According to Plaintiff he called her "stupid," an "idiot," and "stupid fucking bitch," among other things, to which she responded, "leave me alone, you jackass." (Docket No. 40-2 at 61-62).

Because Ms. Mathis was identified as a witness to the altercation, Ms. Harper claims she interviewed her.[2] According to Ms. Harper, Ms. Mathis did not indicate that Mr. Crook called Plaintiff a "bitch," and Plaintiff does not dispute Ms. Harper's contention that nobody told her that Mr. Crook had called Plaintiff a "bitch" during the incident.

Plaintiff was terminated from her employment on September 24, 2010. Ms. Harper made the determination and the stated reason for discharge on Premier's Employee Status Notification form was "rudeness towards co-workers & patients." (Docket No. 40-17). At the time of termination, Plaintiff was 45 years old.

Plaintiff's Complaint is in four counts. Count One alleges discrimination in violation of the

---

[2] In her deposition taken years after the event, Ms. Mathis could not recall whether Ms. Harper spoke to her about the incident. Ms. Mathis did testify, however, that she never heard Mr. Crook use a derogatory word towards Plaintiff and, more specifically, never heard him call Plaintiff "stupid," an "idiot," or a "bitch." (Docket No. 40-8 at 9-10).

Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*.  Count Two alleges

race and gender discrimination, and a hostile work environment in violation of Title VII, 42 U.S.C.

§ 2000e, *et seq.*  Count Three alleges violation of the Americans with Disabilities Act ("ADA"), 42

U.S.C. §§ 12111, *et seq.* and the Tennessee Handicap Act, Tenn. Code Ann.  8-50-103(a).[3]  Finally,

Count Four alleges gender and race discrimination  in violation of the Tennessee Human Rights Act

("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*  Defendant moves for summary judgment on all of

those claims.

## II.  Standard of Review

The standards governing summary judgment are well known.  A party may obtain summary

judgment if the evidence establishes there are no genuine issues of material fact for trial and the

moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Covington v.

Knox Cnty. School Sys., 205 F.3d 912, 914 (6th Cir. 2000).   A genuine issue exists "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty

Lobby, 477 U.S. 242, 248 (1986).   In ruling on a motion for summary judgment, the Court must

construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable

inferences in his or her favor.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

587 (1986).

## III.  Analysis

Plaintiff's Complaint is wide-ranging.  The Court will first consider the federal claims and

then turn to the state law claims.

---

[3] Although pleaded as a Tennessee Handicap Act claim, the Court notes that the statute was renamed
the Tennessee Disability Act ("TDA") effective April 7, 2008.  Tenn. Code Ann. § 8-50-103(a).

**A. Federal Claims**

*1. Title VII – Race and Gender Discrimination Claims*

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff offers no direct evidence of gender or race discrimination and hence the Court utilizes the burden shifting paradigm established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

Under the burden shifting framework, a plaintiff is first required to establish a *prima facie* case of discrimination. If she does so, a presumption of discrimination arises with the burden of production shifting to defendant to articulate some legitimate, nondiscriminatory reason for its action. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993). If the defendant articulates such a reason, the presumption drops from the case, and the plaintiff is then provided the opportunity to show that the reason offered by the defendant is but a pretext for discrimination. See, id. at 508; see also, Wright v. Murray Guard, Inc., 455 F.3d 702, 706-07 (6th Cir. 2006) (applying Title VII burden-shifting framework to gender and race discrimination claims).

Plaintiff's gender and race discrimination claims are grounded upon her termination. To establish a *prima facie* case of gender or race discrimination, Plaintiff must show that "(1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) she was replaced by someone outside the protected class or treated differently from similarly situated, non-protected employees." Loyd v. St. Joseph Mercy Oakland, 766 F.2d 580, 589 (6th Cir. 2014).

Whether based on gender or race, Plaintiff's *prima facie* case fails on the fourth element. Her claims fail because she has not shown that she was replaced by someone outside the protected class. Plaintiff was replaced by Theresa Flowers, a Caucasian female (who had previously filled in as Front Desk Receptions when Plaintiff was on medical leave). While Plaintiff argues that Ms. Flowers has no American Indian ancestry, that fact, or non-fact, is not in the record. To the extent Plaintiff's race and gender discrimination claims are based on anything other than her termination,[4] they fail because she has not shown an adverse employment action. And, to the extent Plaintiff's gender and race discrimination claims are based upon her termination, they fail because she has not shown that she was treated differently from a similarly situated employee, as discussed on more detail below. However, and given that the Sixth Circuit has "held consistently that a plaintiff's burden of establishing a *prima facie* case [of discrimination] is not an onerous one," Wheat v. Fifth Third Bank 785 F.3d 230, 237 (6th Cir. 2015), the Court soldiers on.

Premier has articulated a legitimate non-discriminatory reason for its employment decision. Specifically, Plaintiff was terminated as a result of her inappropriate conduct toward co-workers and patients. See Crabtree v. Sec. Dept. of Homeland Sec., 2015 WL 1948267, at *3 (6th Cir. May 1, 2015) (being "unprofessional and ha[ving] a bad attitude" are legitimate reasons for discharge); Fitten v. Chattanooga-Hamilton Cnty. Hosp. Auth., 75 Fed. App'x 384, 386 (6th Cir. 2003) (co-worker complaints and rudeness were legitimate reasons for dismissal); Garrett v. SW Med. Clinics, PC, 2014 WL 7330947, at *8 (W.D. Mich. Dec. 19, 2014) (failure to meet standards, complaints by

_____

[4] In her Complaint, Plaintiff alleges she was treated differently from other employees because she was tasked with cleaning out office refrigerators and microwaves, and required to stock drinks, candy and snacks. Presumably recognizing that those duties, while perhaps a "'mere inconvenience,'" do not constitute a "'material adverse change in the terms or condition of [her] employment'" Deleon v. Kalamazoo Cnty. Rd. Comm'n, 739 F.3d 914, 918 (6th Cir. 2014) (citation omitted), Plaintiff concedes in her response brief that her discrimination claims are based on her termination.

patients, lack of professionalism, rudeness and tardiness are all legitimate reasons for termination).

Because Premier has set forth a legitimate non-discriminatory reason for its decision, the burden shift back to Plaintiff to show that the stated reason was pretext. Pretext may be shown by demonstrating "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or (3) that they were insufficient to motivate [the adverse employment action]." Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 460 (6th Cir. 2004). With respect to these methods of proof, the Sixth Circuit has observed that the first and third avenues "are direct attacks on the credibility of the employer's proffered motivation for firing plaintiff," while the second approach "attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." Manzer v. Diamond Shamrock, 29 F.3d 1078, 1084 (6th Cir. 1994); accord, Pennington v. Western Atlas, Inc., 202 F.3d 902, 909-10 (6th Cir. 2000)).

Plaintiff does not deny that the altercation with Mr. Crook took place. Rather, her complaint is that she was subjected to termination while Mr. Crook was not, and she challenges the method by which Ms. Harper investigated the incident.

An essential element of a gender or race discrimination claim, which Plaintiff must prove, is that she was treated differently than a similarly situated employee of the opposite sex or of another race for the same or similar conduct. Foster v. Country Fresh, LLC, 563 Fed. App'x 360, 361 (6th Cir. 2014). To do so, Plaintiff "must show that 'all relevant aspects' of her employment situation are 'nearly identical' to those of the alleged similarly situated male employees," Humenny v. Genex Corp., 390 F.3d 901, 906 (6th Cir. 2004), or to those of another race, Seay v. Tenn. Valley Auth., 339 F.3d 454, 479 (6th Cir. 2004). "Moreover, to be deemed 'similarly situated,' the individuals with

whom [Plaintiff] compares herself 'must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Humenny, 390 F.3d at 907 (quoting, Gray v. Toshiba Am. Consumer Products, Inc., 263 F.3d 595, 599 (6th Cir. 2001)).

Plaintiff was not similarly situated to Mr. Crook. It is undisputed that her direct supervisor was Ms. Harper, while Mr. Crook's was Mr. Beaty. Although Plaintiff may have received direction and instructions from Mr. Beaty while he was on the premises, Plaintiff ultimately answered to Ms. Harper and "report[ing] to different supervisors" suggest that employees are not similarly situated. Davis v. Marshall Cnty. Ambulance Serv., 533 Fed. App'x 503, 504 (6th Cir. 2013) (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).

To be sure, the Sixth Circuit has "never read 'the same supervisor criteri[on]' as an 'inflexible requirement.'" Louzon v. Ford Motor Co., 718 F.3d 556, 563 (6th Cir. 2013) (quoting Bobo v. United Parcel Service, Inc., 665 F.3d 741, 751 (6th Cir. 2012)). Nevertheless, and leaving aside for the moment the sufficiency of the investigation, Plaintiff does not dispute that Ms. Harper was never informed that Mr. Crook may have called Plaintiff a "bitch" during the incident, but had been informed that Plaintiff called Mr. Crook an "asshole." Wright, 455 F.3d at 710 (citation omitted) ("to be found similarly situated, the plaintiff and his proposed comparator must have engaged in acts of 'comparable seriousness'"). Moreover, it is also undisputed that, at the time of the incident, Ms. Harper (1) believed that Plaintiff had become increasingly rude; (2) had received complaints about Plaintiff's hostile attitude towards patients (one of which was in writing); and (3) had issued Plaintiff a verbal warning and then a written warning in the months immediately

preceding discharge, the last of which stated that an additional infraction would result in termination. In contrast, there is no evidence that Mr. Crook had received patient complaints or had been issued warnings for behavioral or performance issues. See White v. Duke Energy-Ky, Inc. 603 Fed. App'x 442, 451 (6th Cir. 2015) (citation omitted) ("Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated").

As for the scope of the investigation, it certainly could have been more thorough. While Ms. Harper claims to have interviewed Mr. Crook and Ms. Mathis, it is not altogether clear that occurred because Mr. Crook denies it, and Ms. Mathis does not recall any such conversation. Moreover, Ms. Harper did not interview Mr. Tweedie, the other technician on duty at the time of the incident. According to his deposition testimony, Mr. Crook "got in [Plaintiff's] face," yelled at her, and called her a "stupid bitch," to which Plaintiff responded by raising her voice and calling him a "jackass." (Docket No. 45-7 at 44-46).

Nevertheless, "at the pretext stage, [courts] look to similarly situated employees not to evaluate the employer's business judgment, but to inquire into the employer's 'motivation and intent.'" Wilson v. Cleveland Clinic Found., 579 Fed. App'x 392, 404 (6th Cir. 2014). While not an independent basis for granting summary judgment, the fact that Ms. Harper both hired and fired Plaintiff cuts against a discriminatory animus. See, Wexler v. White's Fine Furniture, 317 F.3d 564, 574 (6th Cir. 2003) ("although a court may infer an absence of discrimination where the same individual hired and fired the plaintiff, such an inference is not required").

Moreover, "[t]he Sixth Circuit has adopted the 'honest belief rule' with regard to an employer's proffered reason for discharging an employee." Weaver v. City of Twinsburg, 580 Fed. App'x 386, 393 (6th Cir. 2014). "The rule 'provides that as long as the employer honestly believed

10

in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless.'" Banks v. Bosch Rexroth Corp., 2015 WL 2109807, at *13 (6th Cir. May 6, 2015) (quoting, Smith v. Chrysler Corp., 155 F.3d 799, 806 (6th Cir. 1998)).  And, "so long as an employer honestly and reasonably believed the nondiscriminatory reason for its action, the employer need not use an 'optimal' decision-making process that leaves 'no stone unturned.'" Crabtree,  2015 WL 1948267, at *4 (quoting Seeger v. Cincinnati Bell Tel. Co., LLC, 681 F.3d 274, 285 (6th Cir. 2012)).

At best, the additional evidence from Mr. Tweedie suggests that Mr. Crook and Plaintiff both engaged in unprofessional conduct, but Plaintiff did so with a blemished work history and while under a final warning.  Summary judgment will be granted on Plaintiffs gender and race discrimination claims.

### 2.  Title VII – Hostile Work Environment Claim

 In addition to prohibiting discrimination, Title VII prohibits "the creation of a hostile work environment" on the basis of an employee's race or gender.  Vance v. Ball State Univ., 133 S. Ct. 2434, 2441 (2013).  To establish such a claim, Plaintiff must show that "'(1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [sex or gender], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.'"  Waldo v. Consumers Energy Co., 726 F.3d 802, 813 (6th Cir. 2013)  (quoting, Williams v. CSX Transp. Co., 643 F.3d 502, 511 (6th  Cir. 2011)).  "The touchstone of any hostile work environment claim . . . is whether 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter

the conditions of the victim's employment and create an abusive working environment.'" <u>Khamati v. Sec'y of Dept. of the Treasury</u> 557 F. App'x 434, 442-43 (6th Cir. 2014) (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)).

To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." <u>Hawkins v. Anheuser-Busch, Inc.</u>, 517 F.3d 321, 333 (6th Cir. 2008) (citing, <u>Harris</u>, 517 U.S. at 21-22). The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive." <u>Bowman v. Shawnee State Univ.</u>, 220 F.3d 456, 462 (6th Cir. 2000). "Among the factors to be considered are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" <u>Clark v. United Parcel Serv., Inc.</u>, 400 F.3d 341, 352 (6th Cir. 2005) (quoting, <u>Harris</u> 510 U.S. at 23).

In her brief, Plaintiff claims that Mr. Beaty subjected her to a hostile work environment because he (1) "referred to her as an old woman oftentimes during her employment"; (2) "called her a 'squaw'"; and (3) "continuously asked her if she was on medication, insinuating she had a mental disorder, in front of co-workers." (Docket No. 45 at 20). Plaintiff also claims that she was subjected to a hostile work environment because she "was expected to work in bad weather conditions, unlike her younger counterpart[,] she was asked to perform work tasks different from the other front desk clerk[,]" and she "was not allowed to take restroom breaks when she needed to take her medication, unlike her younger counterpart who did not even need permission to use the restroom." (Id.) Finally, she claims she was harassed by Mr. Crook because he "regularly called her an 'idiot,'

'stupid' and a 'bitch' in from of co-workers."  (Id. at 21).

The vast majority of things that Plaintiff claims about, however, are not encompassed by that which is pled in her Complaint, specifically a hostile work environment based upon race and/or gender.  Moreover, in response to Defendant's Statement of Undisputed Material Fact about her hostile work environment claim, Plaintiff concedes that she "alleges that 'she was forced to endure a hostile work environment; because of her gender (female) and race (part Native American).'" (Docket No. 46 at 15 ¶ 43).  Untoward comments about age, mental competence, or alleged disability do not suggest harassment based on gender or race.

Additionally, the record that has been developed does not support some of Plaintiff's contentions.  She argues that Mr. Beaty "often" referred to her as an old woman, but, in her deposition, she specifically testified that Mr. Beaty referenced her age "three, maybe four times" during her entire employment at Premier which lasted nearly three years.  (Docket No. 40-2 at 65). Plaintiff further claims that Mr. Beaty (who also claims to be part Native American) called her "squaw" "three to four times a week" and that the statements were overheard by her fellow employees.  (Id. at 50).  She concedes, however, that "no co-worker in the MRI department has corroborated [her] allegation that the 'squaw' comment was made in the presence of co-workers." (Docket No. 46 at 16 ¶ 47).  In fact, Ms. Flowers testified in her deposition that she never heard Mr. Beaty make a demeaning comment about Plaintiff, or ask Plaintiff questions about whether she had taken her medication or been in a mental institution.  (Docket No. 40-18 at 19).  Ms. Mathis testified in the same fashion, but also said that Plaintiff did not particularly care for Mr. Beaty.  (Docket No. 45-6 at 16-17).  In a declaration Mr. Crook (who also claims to be part Native American) states that he never heard Mr. Baety call plaintiff a "squaw or old woman" (Docket No. 40-22 ¶ 3).

At summary judgment, of course, the Court is not allowed to weigh the evidence. However, conclusory assertions that "remarks occurred 'numerous' times, 'often,' or 'regularly'" during several years of employment without any indication of "time, place, or context of the remarks" is insufficient to present a jury question. Fuelling v. New Vision Med. Lab., LLC, 284 Fed. App'x 247, 259 (6th Cir. 2008). Moreover, even when a plaintiff "present[s] a litany of incidents involving allegedly abusive conduct," where "none of the complained-of conduct is overtly or explicitly sexual [or racial] in nature . . . she must present sufficient evidence to raise an inference that but for her sex [or race] she would not have been the object of the harassment." Monak v. Ford Motor Co., 95 Fed. App'x 758, 765 (6th Cir. 2004). Plaintiff has not done so in this case.

There is also a serious question as to whether any alleged harassment affected her job. Although Plaintiff "'need not prove that [her] . . . tangible productivity has declined,'" she must "show that the harassment made it more difficult to do the job.'" Snyder v. Pierre's French Ice Cream Co., 589 Fed. App'x 767, 773 (6th Cir. 2014) (quoting Davis v. Monsanto Chem. Co., 858 F.2d 345, 349 (6th Cir. 1988)). Plaintiff claims that the harassment sometimes reduced her to tears and the change in attitude that her supervisor notice was based on that harassment. This, of course, is subjective and does not address whether, from an objective viewpoint, the harassment was pervasive.

Although the inquiry into whether an environment is hostile is not subject to a "mathematically precise test," Harris, 510 U.S. at 22, and there is no bright line "'between a merely unpleasant working environment . . . and a hostile or deeply repugnant one,'" McPherson v. City of Waukegan, 379 F.3d 430, 438 (7th Cir. 2004) (citation omitted), the Court finds, based upon the totality of the circumstances, that Plaintiff has failed to present a jury issue on whether the conduct

of which she complains was sufficiently severe or pervasive so as to alter the terms and conditions of her employment.

### 3. ADEA Claim

Like discrimination claims under Title VII, "[a] plaintiff may establish a violation of the ADEA by either direct or circumstantial evidence." Geiger v. Tower Auto., 579 F.3d 614, 620 (6th Cir. 2009). Where the circumstantial method is utilized, a court also applies McDonnell Douglas burden shifting. Talley v. Family Dollar Stores, 542 F.3d 1099, 1105 (6th Cir. 2008).

Plaintiff argues that because Mr. Beaty allegedly called her an "old woman," this constitutes direct evidence of discrimination. It does not.

"Direct evidence is evidence that proves the existence of a fact[.]" Rowan v. Lockheed Martin Energy Sys. Inc., 360 F.3d 544, 548 (6th Cir. 2004). That is, "'direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.'" Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 915 (6th Cir. 2013) (quoting, Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003)). Thus, by way of examples,

> courts have found that (1) a supervisor's alleged statement that she chose a particular candidate in order "to maintain racial balance" constituted direct evidence of discriminatory intent, Taylor v. Board of Educ. of Memphis City Schools, 240 Fed. App'x 717, 720 (6th Cir. 2012); (2) a supervisor's alleged statement that an Italian-American probationary employee was a "dirty wop" and that there were too many "dirty wops" working at the facility constituted direct evidence of national origin discrimination, and the supervisor's alleged statement that a 46 year old employee was "no spring chicken" and he would never be a supervisor because of his age was direct evidence of age discrimination, DiCarlo v. Potter, 358 F.3d 408, 471 & 418 (6th Cir. 2004); and (3) providing an employee who intended to return from medical leave with a letter which stated that "given [that] you are unable to perform the tasks of your job, we have found it necessary to hire someone to fill the vacancy created

by your need to take long term disability" and that "[d]ue to your long term disability we must terminate your employment" constituted direct evidence of disability discrimination under the ADA, <u>Coffman v. Robert J. Young Co., Inc.</u>, 871 F. Supp.2d 703, 709 & 713 (M.D. Tenn. 2012).

<u>Lovell v. Champion Car Wash, LLC</u>, 969 F. Supp.2d 945, 951 (M.D. Tenn. 2013) (finding employers letter dismissing plaintiff because of his heart condition to be direct evidence).

Plaintiff points to nothing of the sort in this case. Furthermore, Mr. Beaty was not the one who fired Plaintiff, and nor is there any suggestion that he called Plaintiff an "old woman" at or near the time the termination decision was made. <u>See</u>, <u>Rowan</u>, 360 F.3d at 550 (citation omitted) ("'Statements by non-decision makers, or statements by decision makers unrelated to the decisional process itself [can not] suffice to satisfy the plaintiff's burden' of demonstrating animus,'" for purposes of a direct evidence case, and this applied even where plaintiffs alleged that their immediate supervisor "called them 'old fart' on a 'fairly regular basis.'").

Turning to the indirect method of proof, Plaintiff argues that she was subjected to age discrimination when she was not permitted to transfer into the position of day shift receptionist. However, the undisputed evidence in the record shows that throughout Plaintiff's employment Ms. Mathis was the only day shift receptionist – she was hired before Plaintiff, and she left long after Plaintiff was terminated. Lack of an open position aside, "refusal to allow [Plaintiff] to change shifts is not unlawful because schedule assignments generally are not adverse employment actions." <u>Peters v. Wal-Mart Stores, LP</u>, 512 Fed. App'x 622, 626 (7th Cir. 2013); <u>see</u>, <u>McGowan v. City of Eufala</u>, 472 F.3d 736, 743 (10th Cir. 2006) (failure to grant employee's request to transfer from night shift to day shift was not materially adverse action when there was no difference in pay or benefits and one shift was no more arduous than the other).

Insofar as Plaintiff alleges that her termination was based upon age discrimination that claim,

too, fails at the *prima facie* stage because she has not established that any proposed comparators were either outside the protected class or significantly younger. See Williams v. Union Underwear Co., Inc., 2015 WL 3514384, at * 6 n.2 (6th Cir. June 5, 2015) (noting that some Sixth Circuit cases indicate plaintiff must prove replacement by someone outside the protected class, but that the proper indicia is whether the replacement is substantially younger).[5] It also fails because, as already noted in relation to Plaintiff's gender and race discrimination claims, Defendant has proffered a legitimate non-discriminatory reason for its decision which Plaintiff has not shown to be pretextual. In fact, Plaintiff's failure to produce evidence showing pretext is even more glaring here because, "unlike [her sex or] race discrimination claim, to prevail on age discrimination 'it is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action; rather, the ADEA's "because of" language requires that a plaintiff prove by a preponderance of the evidence that age was the "but-for" cause of the challenged employer decision.'" Lopez v. Am. Family Ins. Co., 2015 WL 3916424, at * 7 (6th Cir. June 26, 2015) (quoting Scheick v. Tecumseh Pub. Schs., 766 F.3d 523, 529 (6th Cir. 2014)).

### 4. *ADA Claim*

The ADA prohibits covered employers from discriminating against a "qualified individual on the basis of disability" with regard to hiring, advancement, training, termination, and "other

---

[5] When Plaintiff was terminated, she was replaced by Ms. Flowers, whose age is not apparent from the record. Mr. Crook, who was Plaintiff's counterpart in the September 16, 2010 incident was apparently 40 years old at the time while Plaintiff was 45 years old. This is not a substantial age difference under the ADEA. See, Johnson v. Lockheed Marting Corp., 598 Fed. App'x 364, 368 (6th Cir. 2015) ("A 'substantially younger' person is someone more than six years younger than the plaintiff"); Grosjean v. First Energy Corp., 349 F.3d 332, 340 (6th Cir. 2003) (analyzing authority and concluding that in "the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant").

terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "The plaintiff shoulders

the initial burden of showing that [s]he is disabled and 'otherwise qualified' for the position, either

without accommodation from the employer, with an alleged essential job requirement eliminated,

or with a proposed reasonable accommodation." Turner v. City of Paris, 534 F. App'x 299, 302 (6th

Cir. 2013) (citing, Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 869 (6th Cir. 2007)).

In her Complaint, Plaintiff alleges in Count Three that she has "been diagnosed with diabetes

or was perceived to have a mental or emotional disability by her supervisor." (Docket No. 1,

Complaint ¶ 27). Specifically with regard to diabetes, Plaintiff alleges:

> In May of 2009 Plaintiff was diagnosed by her doctor as having diabetes. While at
> the doctor's office Plaintiff had turned her mobile phone off. After returning to her
> car from the doctor's office, Plaintiff had several messages from [Mr. Beaty] and one
> from human resources department. Plaintiff called the male supervisor and informed
> him where she was only to be against chastised, embarrassed and humiliated.

(Id. ¶ 11). This is the extent of the allegation surround Plaintiff's disability claim based on diabetes,

and is almost identical with what she told the Equal Employment Opportunity Commission in her

Intake Questionnaire:

> In May 2009, I had been to the doctor that morning since my shift didn't start until
> noon. My phone was off during that time. I was diagnosed that day with diabetes and
> was having a difficult time accepting the news. Once I arrived to my car, I turned my
> phone back on where there were several messages from Ann Harper and James
> [Beaty] that I needed to hurry to get to work b/c Julie didn't make it in the office and
> that I must keep my phone on at all [times] however, I was never compensated for
> my phone bill. Nor was I compensated for my on-call time. James [Beaty's] phone
> bill was paid and he was paid on-call time.

(Docket No. 40-20 at 5).

In both her deposition and her reply brief, however, Plaintiff attempts to characterize her

ADA claim differently. She asserts that Premier violated the ADA because it refused to

accommodate a disability (her diabetes) when Mr. Beaty did not allow her to timely go to the

bathroom so that she could take her insulin shots.[6]  Because of this change, Premier moves for

summary judgment, arguing that Plaintiff has failed to exhaust her administrative remedies.

An ADA plaintiff must file a charge with the EEOC before bringing a court action against

an employer. 42 U.S.C. § 12117(a).  The purpose behind the requirement "is to trigger an

investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the

EEOC to initiate conciliation procedures in an attempt to avoid litigation," Dixon v. Ashcroft, 392

F.3d 212, 217 (6th Cir. 2004), and "'the general rule in this circuit . . . is that the 'judicial complaint

must be limited to the scope of the EEOC investigation reasonably expected to grow out of the

charge of discrimination,'" Weigel v. Baptist Hosp. of E. Tenn., 302 F.3d 367, 379 (6th Cir. 2002)

(citation omitted).  Still, the exhaustion requirement "is not meant to be overly rigid, nor should it

'result in the restriction of subsequent complaints based on procedural technicalities or the failure

of the charges to contain the exact wording which might be required in a judicial pleading.'"

Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 732 (6th Cir. 2006) (quoting EEOC v.

McCall Printing Co., 633 F.2d 1232, 1235 (6th Cir. 1980)).

Plaintiff argues that her reasonable accommodation charge "is not barred because it

reasonably is derived from the named charge of disability discrimination," and, furthermore,

"plaintiff alleged sufficient facts in [her] EEOC charge to put the EEOC on notice of the unidentified

claim." (Docket No. 45 at 18).  The Court disagrees.

Disability discrimination claims and claims alleging failure to accommodate are analytically

---

[6] Plaintiff has apparently dropped her contention that she was perceived as being disabled because
of a mental disability.  Regardless, that claim fails.  Even under the 2008 amendments which broadened the
class of ADA-eligible persons, Plaintiff points to no evidence in the record from which a fair minded jury
could conclude that she "ha[d] been subjected to an [adverse employment] action because of an actual or
perceived . . . mental impairment[.]" 42 U.S.C. § 12102(3)(A).

distinct. "'[T]hey are not like or reasonably related to one another, and one cannot expect a failure to accommodate claim to develop from an investigation into a claim that an employee was terminated because of a disability.'" Whitaker v. Milwaukee Cnty., 772 F.3d 802, 813 (7th Cir. 2014) (quoting Green v. Nat'l Steel Corp., 197 F.3d 894, 898 (7th Cir. 1999)). In other words, "an administrative charge alleging disability discrimination alone does not automatically exhaust administrative remedies for a failure-to-accommodate claim." Lara v. Unified School Dist. #501, 350 Fed. App'x 280, 285 (10th Cir. 2009); see, Jones v. Sumser Retirement Vill., 209 F.3d 851, 853 (6th Cir. 2000) (stating that court does not have subject matter jurisdiction over an ADA claim "unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC charge," and reasonable accommodation claim did not arise from plaintiff's wrongful termination claim); Dunavant v. Frito Lay, 2013 WL 816673, at *9 (M.D. Tenn. Mar. 5, 2013) ("while a charge may be said to include discrimination which may reasonably be expected to grow out of the scope of the initial charge, a disparate treatment claim based upon an alleged disability does not encompass a failure to accommodate claim.").

For example, a plaintiff was found not to have exhausted his reasonable accommodation claim because, while he checked the box for disability on the EEOC questionnaire form and also filled out the section regarding disability, he "checked 'no' in response to the question: 'Did you advise your employer that you needed an accommodation?'" and "the text of the charge d[id] not contain facts that would prompt an investigation of [plaintiff's claim] claim that [defendant] failed to accommodate him." Jones v. United Parcel Serv., Inc., 502 F.3d 1176, 1187 (10th Cir. 2007). Similarly, because "failure to accommodate and disparate treatment represent distinct categories of disability discrimination under the ADA," a plaintiff was found not to have exhausted his failure to

accommodate claim where he simply mentioned in his charge: "I believe that I have been discriminated against in that I have been perceived as having a disability in violation of the Americans with Disabilities Act of 1990." Hamar v. Ashland, Inc., 211 Fed. App'x 309, 310 (5th Cir. 2006).

In this case, as in Jones, Plaintiff checked the box for "disability" discrimination on the face of the charge and, like the plaintiff in Hamar, stated that "I believe that I have been discriminated against in violation of the Americans with Disabilities Act of 2008." (Docket No. 40-20 at 1). However, on the Intake Questionnaire, Plaintiff did not check the block for disability discrimination, nor did she answer any of the questions that were supposed to be filled out if she was "claiming discrimination based on disability." (Docket No. 40-21). This included a question similar to that in Jones which asked whether she asked her "employer for any changes or assistance to do [her] job because of [her] disability," and then asked for details about the request and any response.

The only alleged facts in the EEOC charge or Intake Questionnaire that remotely suggests Plaintiff was treated differently because of a disability is the reference to her receiving calls while she was at her doctor's office on the day that she was diagnosed with having diabetes. This would hardly prompt an investigation into whether Mr. Beaty denied her bathroom breaks, particularly since Plaintiff did not claim before the EEOC that she asked for or was denied any accommodation. She has failed to exhaust her administrative remedies with respect to her ADA claim.

**B. State Law Claims**

Plaintiff's state law claims are subject to dismissal for substantive and procedural reasons.

Substantively, the Tennessee Supreme Court "[i]nterprets the THRA similarly, if not identically to Title VII[.]" Ferguson v. Middle Tenn. State Univ., 451 S.W.3d 375 (Tenn. 2014).

The THRA, in turn, "employs similar language as that used in the ADEA and the analysis under both statutes is substantially the same." Geller v. Henry Cnty. Bd. of Ed., 2015 WL 3461608, at *1 n.1 (6th Cir. June 1, 2015). In other words, "[t]he same general analytical framework and allocation of the burden of proof is used for claims under both federal and state statutes, irrespective of whether the claim asserts discrimination on the basis of race, age, sex, or any other class protected under the Act." Bundy v. First Tenn. Bank Nat'l Ass'n, 266 S.W.3d 410, 416 (Tenn. Ct. App. 2007). Thus, for the reasons already stated, Plaintiff's state law gender, race, and age discrimination claims fail on the merits.

Plaintiff's TDA claim also fails on the merits. Unlike the ADA, "administrative remedies need not be exhausted." Sneed v. City of Red Bank, 459 S.W.3d 17, 27 (6th Cir. 2014). However, and "'[u]nlike its federal counterpart, the portion of the THRA that prohibits discrimination on the basis of disability does not require employers to provide disabled workers with reasonable accommodations.'" Jones v. Sharp Elec. Corp., 2014 WL 806131, at *4 (Tenn. Ct. App. Feb. 28, 2014) (citation omitted); Bennett v. Nissan No. Am., Inc., 315 S.W.3d 832, 841-42 (Tenn. Ct. App. 2009) ("the TDA elements are very similar to those of the ADA, but do not include a 'reasonable accommodation' component"). Thus, Plaintiff's assertion that Mr. Beaty failed to provide her with bathroom breaks in the form of a reasonable accommodation does not state a cognizable claim under the TDA.

Procedurally, Plaintiff's state law claims are untimely. Plaintiff concedes that her Complaint was filed after the one year statute of limitations found in Tenn Code Ann. § 4-21-311, but asks the court to equitably toll the limitations period. In this regard, Plaintiff argues that she "had no actual or constructive knowledge of the filing requirement," "was dealing with family member's [sic] that

were terminally ill," and "[t]herefore, she waited a long time before even seeking the advice of counsel of an attorney." (Docket No. 45 at 23). Plaintiff also argues that she had to wait until the EEOC gave her a right to sue letter before she could file her state law claims.

"The equitable doctrine [is] applied 'only sparingly.'" Gordon v. England, 2015 WL 3388448, at * 4 (6th Cir. 2015) (quoting Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990)). It does not provide relief for "garden variety" neglect, but rather "allows a federal court 'to toll a statute of limitations when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.'" Jackson v. United States, 751 F.3d 712, 719 (6th Cir. 2014).

Plaintiff has not shown excusable neglect, even accepting as true her assertion that she delayed in consulting with an attorney because she did not know the law and was distracted by having to care for ill family members. The EEOC Charge and Intake Questionnaire were completed on May 9, 2011, and Plaintiff indicated at that time that she had consulted with the lawyer who now represents her in this case. Since Plaintiff claims that the discrimination occurred up until the date of her discharge on September 24, 2010, this means that Plaintiff or her counsel still had more than five months from the filing of the EEOC charge to file a timely state law claim.

Plaintiff's assertion that she had to wait until the EEOC provided her with a right to sue letter is without merit. The "limitations period [in the THRA] is not tolled while administrative charges are pending before the Tennessee Human Rights Commission or the Equal Employment Opportunity Commission." Agent v. Buffalo Valley, Inc., 2015 WL 1756891, at *2 (M.D. Tenn. April 17, 2015); accord, Artis v. Finishing Brands Holdings, Inc., 2015 WL 1268027, at *24 (W.D. Tenn. Mar. 19, 2015); Martin v. Boeing–Oak Ridge Co., 244 F. Supp.2d 863, 871 (E.D. Tenn. 2002).

## IV.  Conclusion

On the basis of the foregoing, Defendant's Motion for Summary Judgment will be granted.

An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE